## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| YOLANDA DAWSON, | ) | 3:20-CV-01310 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SECURITY SERVICES OF | ) | |
| CONNECTICUT INC., | ) | December 6, 2022 |
| *Defendant*. | ) | |

## RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Plaintiff Yolanda Dawson ("Plaintiff") has brought this action against Defendant Security Services of Connecticut Inc. ("Defendant"), alleging that Defendant discriminated against Plaintiff based on her religion, disability, and medical condition by terminating her employment instead of providing reasonable accommodations to her. The complaint contains three counts: (1) discrimination on the basis of medical issues and religious affiliation under the Connecticut Fair Employment Practices Act ("CFEPA"); (2) discrimination under the Americans with Disabilities Act ("ADA"); and (3) discrimination based on Plaintiff's religion in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

Presently before the Court are Defendant's motion for summary judgment, which argues that Plaintiff has not demonstrated a *prima facie* case of discrimination and that, even if she has, Defendant had a nondiscriminatory, non-pretextual reason for terminating Plaintiff's employment, and Defendant's motion to preclude the testimony of Plaintiff's treating physician, Dr. Orett Brown. In response to Defendant's motions, Plaintiff argues that there are disputed issues of material fact such that summary judgment is not appropriate, and that Dr. Brown's testimony should be admissible for summary judgment and at trial.

For the reasons set forth herein, the Court GRANTS Defendant's motion for summary judgment.  The Court further DENIES as moot Defendant's motion to preclude Dr. Brown's testimony.

## I.      FACTUAL BACKGROUND

Many of the facts in the instant matter are undisputed.[1]  Defendant is a private security company that provides trained security personnel to its clients.  Pl.'s L. R. 56(a)2 St., ECF No. 57-12, ¶ 1.  Defendant employs security officers who are assigned to certain sites on a permanent basis, as well as Security Response Team Members ("SRTs") who do not have regular assignments but, rather, work where needed depending on Defendant's daily requirements.  *Id.* ¶ 2.  All officers and SRTs are specifically trained for each site at which they work.  *Id.*

Defendant offers several different positions to its SRTs.  Employees holding the SRT-1 position are compensated at the highest rate and are guaranteed to be offered at least forty work hours per week, but they "must be available 24/7."  *Id.* ¶¶ 15–16.  Employees in the SRT-2 position may impose one schedule restriction per week, but this position has no minimum weekly guaranteed hours and is compensated at a lower rate.  *Id.* ¶ 18.  Finally, employees in the SRT-3 position may impose multiple schedule restrictions per week, but they have no weekly hours guarantee, and are in turn compensated at the lowest rate.  *Id.*

Each of Defendant's employees is given a handbook when they begin their employment. *Id.* ¶ 45.  The employees are expected to review that handbook and comply with all conditions laid out therein.  *Id.*  One such condition is that employees are not to leave their post prematurely without first notifying and obtaining permission from Defendant.  *Id.* ¶ 46.  Under the handbook, leaving or abandoning a post unattended "for any reason at any time" may subject an employee to

---

[1] Where the Plaintiff has admitted a fact, the Court cites only to Plaintiff's Local Rule 56(a)2 statement.

discharge, even if such an event happens only once. *Id.* ¶ 47. Additionally, employees are required to check their timesheets for accuracy each week and confirm that the listed information is correct; an employee could be discharged for falsification of time logs. *Id.* ¶¶ 47, 51.

Neither party disputes that in the security industry, attendance is important. Defendant is required to provide trained personnel for all contracted hours to ensure its client's property is secure. *Id.* ¶ 3. As such, if an officer or SRT cannot make their assigned shift, substitute personnel must be assigned to ensure the client's premises are never left unsecured. *Id.* If an employee of Defendant does not show up for his or her scheduled shift without prior notice, that is considered a "no call/no show." *Id.* ¶ 23. Similarly, any failure to show up to work when scheduled is considered "an absence," and each absence is considered a separate "incident." *Id.* Pre-approved requests for time off, or leaves of absence, do not count as incidents. *Id.*

Plaintiff began her employment with Defendant around June 26, 2018. *Id.* ¶ 11. At the time she was hired, Plaintiff elected the role of SRT-1. *Id.* ¶ 12. In doing so, she acknowledged that she wanted assignments on both weekdays and weekends during the first, second, or third shifts. *Id.* ¶ 19. She also agreed that she was willing to work a maximum of sixteen consecutive hours when necessary. *Id.* ¶ 14. At the time she was hired, Plaintiff was asked if she required any accommodations to allow her to adequately perform her job duties. *Id.* ¶ 21. Plaintiff did not request an accommodation for either religious or medical needs at that time. *Id.*

Only a few months after she began working for Defendant, Plaintiff began having attendance problems. The parties disagree on precisely when Plaintiff was first warned of these issues: Defendant claims it was on November 13, 2018, ECF No. 36-11 at 1, while Plaintiff claims it was on December 12, 2018, ECF No. 57-3 at 2. Regardless, it is undisputed that Plaintiff was warned that her persistent unexcused absences were becoming a problem. Around this same time,

from November 26, 2018, through December 26, 2018, Plaintiff took a leave of absence from her position. Pl.'s L. R. 56(a)2 St. ¶ 26. While the reason for the leave, as provided on Plaintiff's request form, was an unspecified medical condition, it is undisputed that Plaintiff did not provide Defendant with medical documentation to support the medical leave. *Id.*; ECF No. 57-7 at 3. Indeed, throughout her entire employment with Defendant, Plaintiff never provided Defendant with any medical documentation related to migraines, thyroid issues, or any other medical conditions, with the exception of records relating to an abdomen test in September of 2018. Pl.'s L. R. 56(a)2 St. ¶ 27.[2]

In February of 2019, Defendant's Human Resources Manager, Deilian Morales Gonzalez, was notified that Plaintiff was not meeting her SRT-1 requirements. *Id.* ¶ 30. As a result, on February 22, 2019, Gonzalez had a telephone conversation with Plaintiff to discuss her SRT status. *Id.* ¶ 31. During this conversation, Plaintiff informed Gonzalez that she did not want to work Sunday mornings so she would be able to attend church. Def.'s L. R. 56(a)1 St., ECF No. 36-2, ¶ 32. After this conversation, Gonzalez sent Plaintiff an email granting her an accommodation that she would not be required to work Sunday mornings, in order to facilitate her attending church, while also allowing her to keep her SRT-1 status and pay. *Id.* ¶ 33. Plaintiff contends in this lawsuit that she not only requested an accommodation to be able to attend church, but also an accommodation that she not be required to work a Saturday overnight shift, to allow her to be rested for church on Sunday. Pl.'s L. R. 56(a)2 St. ¶ 32. Plaintiff, however, has presented no evidence that she ever actually made that request of Defendant. In fact, Plaintiff has admitted that she "never responded to Defendant's email to indicate the accommodation was not sufficient." *Id.* ¶ 34.

---

[2] Plaintiff tacitly admits this fact by claiming that she provided Defendant with a letter from Dr. Brown about her thyroid disease only *after* her termination. *Id.* ¶ 27.

In April of 2019, Plaintiff accepted a double shift at The Greater Hartford Transit District ("Union Station"). *Id.* ¶ 36. This assignment required her to work from 4:00 p.m. on Friday, April 5, until 8:00 a.m. on Saturday, April 6. *Id.* Despite this scheduling, Union Station preferred that security officers not do full double shifts, so Plaintiff was to be relieved at 4:00 a.m. instead of 8:00 a.m. on April 6. *Id.* ¶ 37. Due to confusion with the schedule, however, Plaintiff's relief failed to report at 4:00 a.m. *Id.* When her relief failed to arrive, Plaintiff called Defendant's communication center four times to inquire about when she would be relieved. *Id.* ¶ 38.

At some time between 4:00 a.m. and 6:00 a.m., without her relief arriving, and without notifying Defendant, Plaintiff left her post at Union Station unattended, giving the master keys to the site to an employee of a Dunkin' Donuts shop located within Union Station. *Id.* ¶ 39. Plaintiff did not request authorization to leave the keys with this third party, nor did she inform Defendant that she had done so. *Id.* ¶ 40. Despite leaving before her assigned time of 8:00 a.m. that morning, Plaintiff later submitted a time sheet attesting that she had worked the complete shift until 8:00 a.m. *Id.* ¶ 42. Furthermore, later that same day, April 6, Plaintiff texted her supervisor that she had worked "16 straight hours." *Id.* ¶ 43. Her supervisor apologized that she was not relieved on time but asked that she still report to her next shift, which began Saturday evening, and arranged for her to begin that shift three hours late so that she could rest. ECF No. 57-6 at 4–5. He also promised to pay her for the entire next shift, despite that she would arrive late. *Id.* at 5.

Two days after this incident, Defendant placed Plaintiff on investigative leave and sent her a second written warning for violating the policy related to leaving one's post unattended. *Id.* ¶ 53. With this warning, Defendant's disciplinary action protocol was triggered. The process employed by Defendant involved several steps. First, the employee would be given an opportunity to respond to the warning, and human resources would investigate the circumstances giving rise

to it. *Id.* ¶ 54. After the investigation, the warning was presented to a Business Integrity Committee ("BIC"). *Id.* ¶ 5. The BIC consisted of several members of Defendant's senior management and human resources personnel that convene to consider imposing discipline. *Id.* They were then given a "blind" presentation that informed the BIC of the proposed discipline and why it was being considered, but that did not reveal any information regarding the subject of the potential discipline, such as identifying information about the employee or information related to where the alleged incident occurred. *Id.* Thus, the BIC members were unaware of the gender, race, religion, or disability status of the subject employee when considering a disciplinary action. *Id.* After receiving this information, the BIC determined whether the written warning would stand, or be revised or withdrawn, and whether additional discipline was warranted. *Id.*

This process was followed in Plaintiff's case. *Id.* First, an investigation was conducted by Sheila Quinones, Assistant Director of Human Resources. Quinones spoke to Plaintiff on April 12, 2019, and allowed her to return to work during the pendency of the investigation. *Id.* ¶ 55. On April 24, Plaintiff sent an email to Quinones admitting to abandoning her post and giving the keys to a Dunkin' Donuts employee. *Id.* ¶ 56. She attributed these actions to her feeling ill from being overworked, but did not mention anything about other medical issues, including issues with her thyroid. *Id.* ¶¶ 56–57.

At the completion of her investigation, Quinones presented her findings to the BIC. *Id.* ¶ 60. In compliance with Defendant's policy, the findings were presented without any identifying information regarding either Plaintiff or the location of the incident. *Id.* Ultimately, Plaintiff was terminated from her position with Defendant on April 26, 2019. *Id.* ¶ 11. Defendant contends Plaintiff was terminated based on her actions taken while on the job, including abandoning her position, leaving the keys with an unauthorized person, and falsifying her time sheet by attesting

that she worked the entire sixteen-hour shift. *Id.* Plaintiff, on the other hand, claims that these reasons are pretextual and she was actually terminated based on discrimination against her religious and medical needs.

## II.      LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is the moving party's burden to show there are no disputed material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by pointing out an absence of evidence to support the non-moving party's case. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). If the moving party demonstrates there are no disputed issues of material fact, the burden shifts to the non-moving party to rebut this showing through introduction of "specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

When examining the record, "the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

### III.       DISCUSSION

Defendant seeks summary judgment on all three of Plaintiff's claims.  The Court first addresses Plaintiff's claims related to her alleged religious discrimination before turning to her claims alleging disability discrimination.

### A.   Discrimination Under Title VII and the CFEPA Based on Religion (Counts One and Three)

At oral argument, Plaintiff clarified that her religious discrimination claims are based on the legal theories of disparate treatment and failure to accommodate.  *See, e.g., Weber v. City of New York*, 973 F. Supp. 2d 227, 249 (E.D.N.Y. 2013) ("[a] plaintiff may claim a violation of religious discrimination under Title VII under theories of either disparate treatment or denial of reasonable accommodation") (internal quotation marks omitted).  Plaintiff also claims that she was terminated in retaliation for protected activity regarding her religious beliefs.  The Court will examine whether there is a question of material fact concerning each theory.

#### 1.   Religious Discrimination Through Disparate Treatment

Under both federal and state law, it is "an unlawful employment practice for an employer . . . to discharge . . . any individual . . . because of such individual's . . . religion."  42 U.S.C.A. § 2000e-2(a)(1) (hereafter "Title VII"); *see also* Conn. Gen. Stat. Ann. § 46a-60(b)(1).[3]  As in all Title VII discrimination claims, the Court must examine the present action under the familiar burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Weber*, 973 F. Supp. 2d at 250. Under this framework, "[P]laintiff bears the initial

---

[3] The Connecticut Supreme Court has made clear that discrimination claims under Connecticut state law should be considered "in the same manner as federal courts evaluate federal discrimination claims." *Jackson v. Water Pollution Control Auth. of City of Bridgeport*, 900 A.2d 498, 508 n.11 (Conn. 2006).  Thus, for simplicity, this Court will examine both the state and federal claims together, while relying on federal law.  *Miller v. Hartford Fire Ins. Co*., 652 F. Supp. 2d 220, 228 (D. Conn. 2009) (applying federal law to both state and federal employment discrimination claims and noting: "Connecticut courts look to federal employment discrimination precedent in analyzing claims brought pursuant to the Connecticut Fair Employment Practices Act. . . . This court will analyze [the plaintiff's] federal and state law claims together.").

burden of establishing a *prima facie* case of discrimination." *McDonnell Douglas Corp.*, 411 U.S. at 802.  If Plaintiff successfully makes such a showing, the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *Id.*  If Defendant proffers such a reason, Plaintiff must then show that this reason is merely pretext for a truly discriminatory motive.  *Id.* at 804.  This opportunity to show Defendant's reason is pretextual "merges with the ultimate burden of persuading" the factfinder that Plaintiff has been the victim of intentional discrimination.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981).

In the instant action, although Plaintiff's burden to demonstrate a *prima facie* case of discrimination is *de minimis*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005), Plaintiff fails to meet her burden.  Even if Plaintiff were able to establish a *prima facie* case of discrimination, however, Defendant has offered several legitimate, nondiscriminatory reasons for terminating Plaintiff.  Plaintiff in turn has failed to offer any evidence showing such reasons were pretextual.  Plaintiff's claim thus fails for numerous reasons.

a.   *Plaintiff Has Failed to Prove Her Prima Facie Case*

In order for Plaintiff to make out a *prima facie* case of discrimination, she must show that "1) [s]he belonged to a protected class; 2) [s]he was qualified for the position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Cutler v. Stop & Shop Supermarket Co.*, 513 F. App'x 81, 82 (2d Cir. 2013); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (applying same framework in the context of an allegedly discriminatory discharge).

To be sure, the burden placed on Plaintiff at this stage is "*de minimis*" and requires only that the plaintiff "proffer[] admissible evidence show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Cronin v. Aetna Life Ins. Co.*,

46 F.3d 196, 204 (2d Cir. 1995).  Despite this low bar, "even in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  In the present action it is undisputed that Plaintiff is a member of a protected class (a Christian), that she was qualified to be employed in the position in question, and that her employment was terminated.  Thus, the only remaining question is whether this adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

Plaintiff has failed to offer any evidence of such an intent.  Specifically, Plaintiff has acknowledged that on the morning of April 6, 2019, she abandoned her post at Union Station and gave the keys to Union Station to an unauthorized employee of Dunkin' Donuts.  Pl.'s L. R. 56(a)2 St. ¶ 56.  Plaintiff further admits that these violations were grounds for immediate termination from her position.  *Id.* ¶ 65.  Crucially, Plaintiff also admits that the discipline imposed on her was consistent with discipline imposed on other employees in all known instances of similar violations. *Id.* ¶ 66.  Finally, Plaintiff is not aware of any instance in which an employee has abandoned his or her post without authorization, given the keys to unauthorized personnel, and not been terminated.  *Id.* ¶ 67.  Instead, Plaintiff points to a single instance of an employee known only as Desia, who once left keys with an unauthorized person.  *Id.* ¶ 70.  While Defendant admits this happened, Desia, unlike Plaintiff, sought and obtained permission for her actions prior to taking them.  *Id.* ¶ 71.  Thus, while Desia was not terminated, her conduct was not comparable to Plaintiff's and, as a result, this example does nothing to advance Plaintiff's position. *See Bjorklund v. Golub Corp.*, No. 3:18-CV-1271 (MPS), 2020 WL 902602, at *5 (D. Conn. Feb. 25, 2020) (a plaintiff must show she is "similarly situated in all material respects to the individuals with whom she seeks to compare herself," meaning that she was "subject to the same workplace standards"

and that "the conduct for which the employer imposed discipline was of comparable seriousness" (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)), *aff'd*, 832 F. App'x 97 (2d Cir. 2021)).

Perhaps most damaging to Plaintiff's argument, however, is the process by which Plaintiff was terminated. Specifically, Plaintiff's case was reviewed by a BIC that had *no* identifying information related to Plaintiff. *Id.* ¶ 60. In fact, at the time it was determined that Plaintiff would be terminated, the BIC had no knowledge of her name, race, gender, religion, alleged disability, or any other identifying information. Louise Linsky Aff., ECF No. 36-37, ¶ 9. Based on this process, the Court is at a loss as to how it would have been possible for Defendant to have discriminated against Plaintiff based on her religion in its decision to fire her. Plaintiff has presented no explanation for how such discrimination could have occurred.

Thus, it is clear to the Court that Plaintiff has failed to carry even her minimal burden of proving her *prima facie* case of religious discrimination under Title VII. Nevertheless, in the interest of completeness, the Court examines below whether Defendant has proffered legitimate, nondiscriminatory reasons for her termination.

> b.  *Defendant Has Presented Legitimate, Nondiscriminatory Reasons for Terminating Plaintiff*

Where a plaintiff has established a *prima facie* case of discrimination, the defendant then assumes the "burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations omitted). Importantly, Defendant need not prove these reasons are the actual reasons for the adverse employment action; rather, "by producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons," Defendant sustains its burden under the second step of the *McDonnell Douglas* framework. *Id.*

Here, Defendant has met its burden of presenting such evidence. Specifically, it is undisputed that Plaintiff left her post at Union Station unattended and gave the keys to an unauthorized person when she left. Pl.'s L. R. 56(a)2 St. ¶ 56. It is further undisputed that Plaintiff submitted a time sheet attesting that she had worked her entire shift at Union Station until 8:00 a.m., when in fact she had not. *Id.* ¶ 42.[4] Plaintiff also acknowledges that each of these offenses would justify terminating her employment with the company. *Id.* ¶¶ 66–68. It is thus clear that Defendant has presented legitimate, nondiscriminatory reasons for terminating Plaintiff.

c. *Plaintiff Has Failed to Present Admissible Evidence Showing Defendant's Nondiscriminatory Reason Was Pretextual*

As Defendant has "produced evidence that it acted for a non-discriminatory reason," if Plaintiff had demonstrated a *prima facie* case of discrimination, she could no longer rely on the "presumption of discrimination raised by" that showing. *Holcomb*, 521 F.3d at 141. Instead, she would need to present "evidence sufficient to permit a rational trier of fact to conclude that the adverse employment action was more likely than not motivated by unlawful discriminatory animus based on h[er] protected status." *Sanchez v. Conn. Nat. Gas Co.*, 421 F. App'x 33, 35 (2d Cir. 2011). As discrimination requires an investigation of the subjective intent of a defendant, "[d]irect evidence of discrimination, 'a smoking gun,' is typically unavailable." *Holcomb*, 521 F.3d at 141. Instead, this showing is more likely to be made using circumstantial evidence, including a showing that "the employer's stated reason for the adverse employment action is entirely pretextual." *Id.* The Supreme Court has been clear, however, that such a showing "does not *compel* judgment for

---

[4] While Plaintiff contends in her briefing that she was authorized to receive pay for the entire shift at Union Station by her supervisor, the very evidence offered by Plaintiff to substantiate this claim actually disproves it. *See* ECF No. 57-6 at 4–5. Specifically, on April 6, Plaintiff represented to her supervisor that she "did 16 straight hours" and that she was too tired to work again later that same day. In exchange for her having worked that much, her supervisor offered to allow her to come late to her *next shift* while still paying her for a full eight hours at her *next shift*. *Id.* The evidence thus does not support that Plaintiff was entitled to claim she worked a full sixteen hours on the night of April 5 into the morning of April 6 at Union Station.

the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000) (emphasis in original). Rather, the ultimate question for the Court at this step is whether a reasonable jury could find, based on all the evidence, that Defendant had a discriminatory motive in terminating Plaintiff. *St. Mary's Honor Ctr.*, 509 U.S. at 511.

The only arguments put forth by Plaintiff that Defendant's actions were pretextual are that she received her first warning for absences during her month-long medical leave and that, despite giving Plaintiff Sunday mornings off so she could attend church, Defendant scheduled her for other shifts that made it difficult for her to, in fact, attend church. ECF No. 57-1.

As to Plaintiff's first argument, Defendant has submitted an email sent to Plaintiff on November 16, 2018, prior to her requested medical leave, warning her about her unauthorized absences. ECF No. 36-11. Plaintiff has not claimed that she did not receive this email. Instead, she has merely supplied an additional email chain containing follow-up emails about the warning dated between December 6 and 12, 2018, to support her contention that she first received the warning on the date of the latest of these emails, December 12, 2018. ECF No. 57-3. But the email chain submitted by Plaintiff is incomplete, as it clearly references an "email below" that Plaintiff did not submit to the Court. *See id.* at 3 (December 6, 2018, email from Morales to Plaintiff stating, in part, "I'm following up on the email below"). Even crediting Plaintiff's version of events, however, Plaintiff's argument appears to be that, because Defendant first addressed Plaintiff's attendance issues while she was on medical leave, Defendant discriminated against her based on her *medical condition*. This does nothing to help her *religious discrimination* claim. Further, regardless of when she received the warning, Plaintiff does not contest that she was in fact absent on the dates in question, which precipitated the warning. Most significantly, Defendant did not rely on Plaintiff's prior absenteeism as a reason for her termination. Thus, the Court is

unconvinced that any evidence concerning when Plaintiff was first notified about her absenteeism demonstrates that Defendant's reasons were pretextual.

As for Plaintiff's second argument, that giving her Sunday mornings off was insufficient because she was still prevented from attending church based on her other shifts, she admits she did not express such concerns to Defendant.  Pl.'s L. R. 56(a)2 St. ¶ 34.  Instead, Plaintiff relies on the fact that she complained to her supervisor in text messages on April 6, 2019, regarding being asked to work too many hours.  ECF No. 57-6.  Nowhere in these complaints, however, does Plaintiff mention church or her religion.  *Id.*  Thus, the Court does not see how these actions in any way demonstrate that Defendant's stated reasons for terminating Plaintiff were pretextual.

Finally, Plaintiff has presented no evidence that any employee who did not request a religious accommodation was in any way treated better than she was.  In fact, as discussed above, no employee has ever committed the actions Plaintiff has committed and retained her job.  Thus, no reasonable jury could conclude that Plaintiff has presented a case for religious discrimination through disparate treatment.

### 2. *Religious Discrimination Through Failure to Accommodate*

In addition to a traditional claim for discrimination by way of disparate treatment under Title VII, Plaintiff also advances a failure to accommodate theory.  It is unlawful for an employer "not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees."  *Trans World Airlines Inc. v. Hardison*, 432 U.S. 63, 74 (1977).  In order to prove a *prima facie* failure to accommodate claim, a plaintiff must show "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement."  *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir.

2006) (quoting *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001)).  If the employee establishes a *prima facie* case, the burden shifts to the employer to show that it could not accommodate the employee's religious beliefs without undue hardship.  *Knight*, 275 F.3d at 167. In this circumstance, too, Plaintiff has failed to establish her *prima facie* case, but, in any event, Defendant offered her an adequate accommodation.

<blockquote>a.   *Plaintiff Fails to Demonstrate Her Prima Facie Case*</blockquote>

It is undisputed that Plaintiff held a bona fide religious belief conflicting with her employment—specifically, that she could not work on Sunday mornings so that she could attend church services—and that, in February of 2019, she informed Defendant of this belief.  Thus, Plaintiff must only demonstrate that she was disciplined for failure to comply with a conflicting employment requirement.  Defendant contends that she cannot do so, and the Court agrees.

In order to meet the third prong of her *prima facie* case, Plaintiff must show "some adverse employment action—typically, discipline, demotion, transfer or termination—for refusing to comply with the conflicting employment requirement." *O'Neill v. City of Bridgeport Police Dep't*, 719 F. Supp. 2d 219, 225 (D. Conn. 2010); *see also Bowles v. N.Y. City Transit Authority*, 285 Fed. Appx. 812, 813–14 (2d Cir. 2008) (affirming district court's holding that the third prong of a plaintiff's *prima facie* failure to accommodate case requires a materially adverse change in terms and conditions of employment).  Here, the employment requirement with which Plaintiff allegedly could not comply was Sunday morning work that would prevent her from attending church. Plaintiff has never alleged or argued, however, that she failed to report for a Sunday morning shift, opting to go to church instead.  Rather, she attended the shifts she was assigned.  As she never

refused to work in favor of her religious responsibilities and therefore was not disciplined for doing so, Plaintiff cannot establish her *prima facie* case.  *Id.* at 226–27.[5]

                                 b.   *Defendant Offered Plaintiff a Reasonable Accommodation*

Even if Plaintiff had demonstrated a *prima facie* case of discrimination, summary judgment for Defendant would still be warranted because Defendant offered Plaintiff a reasonable accommodation.  In February of 2019, upon Plaintiff's request for accommodation, Defendant informed Plaintiff that she would not be scheduled to work Sunday mornings so she could attend church.  ECF No. 36-17 at 2.  Despite that SRT-1s are typically not allowed any schedule restrictions, Defendant allowed Plaintiff to make this schedule restriction while allowing her to maintain her position as an SRT-1.  *Id.*  After being offered this accommodation, Plaintiff never complained or otherwise informed Defendant that this accommodation was in any way ineffective or insufficient.  Pl.'s L. R. 56(a)2 St. ¶ 34.

Furthermore, the Court does not see how such an accommodation could be insufficient. The Second Circuit has held that "employees are not entitled to hold out for the most beneficial accommodation."  *Baker*, 445 F.3d at 548.  While Plaintiff may have preferred that she not work at all on Sunday, there is no evidence before the Court that such an accommodation was necessary, nor is there evidence that Plaintiff ever made such a request of Defendant prior to litigation.  Here, Plaintiff has not argued that her religious belief prohibited her from working at all on Sundays;

---

[5] While Plaintiff has not raised this point, the Court is not unsympathetic to the potential catch-22 that plaintiffs are confronted with as a result of this rule.  When faced with similar facts in *O'Neill*, Judge Kravitz noted that "a diligent employee who never refused to work . . . despite the conflict with his religion" would potentially be unable to bring a claim for religious discrimination while a less diligent employee who "just refused to show up" and was terminated, would have the ability to bring an action.  *O'Neill*, 719 F.Supp.2d at 226.  Thus, Judge Kravitz asked, "should an employee have to risk termination in order to bring a religious discrimination claim based on failure to accommodate?" *Id.*  Despite the seemingly harsh nature of such a rule, here, as in *O'Neill*, the answer appears to be yes.  As Judge Kravitz noted, there may be good reasons for this rule, as it may lead to the parties attempting to resolve their dispute before resorting to litigation.  *Id.*  Regardless of the rule's merits, however, it is the law in this circuit, and the Court is bound by it.

rather, she sought an accommodation to be able to attend church on Sunday mornings, which Defendant granted.  Additionally, to the extent Plaintiff now argues that Defendant scheduled her for shifts that began Saturday night at 11 p.m. and ended Sunday morning at 8 a.m., and then shifts for later in the day on Sunday, such that it was "extremely difficult" for Plaintiff to attend church on Sunday morning, *see* ECF No. 57-1 at 8, it is undisputed that she never informed Defendant that the accommodation it had given to her was insufficient for her needs.  Therefore, although questions of whether an accommodation is reasonable are ordinarily best left to the finder of fact, *see Baker*, 445 F.3d at 548, here no reasonable jury could find that Defendant failed to accommodate Plaintiff's religious needs.

### 3. Retaliation

Finally, under both the CFEPA and Title VII, Plaintiff can recover if she can show that she was terminated in retaliation for engaging in a protected activity.  The analysis of retaliation claims under the CFEPA is "the same as under Title VII" and "courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green.*"  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) (citing *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002)).  Thus, if Plaintiff "presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action." *Id.* at 552–553.  If defendant offers such a reason, the burden shifts back to plaintiff to present evidence that the defendant's proffered reason is pretextual. *Id.* at 553.  In the context of a retaliation claim, to show that a defendant's proffered reasons are pretextual, a plaintiff "must show that one of her complaints was a but-for cause of her termination."  *Goins v.*

*Bridgeport Hosp.*, 555 F. App'x 70, 73–74 (2d Cir. 2014) (citing *Univ. of Tex. Sw. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).[6]

a.   *Plaintiff has Made a Prima Facie Showing of Retaliation*

To state a *prima facie* case, Plaintiff must show "1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (cleaned up).  The plaintiff's burden of proof at this first step is *de minimis*. *Id.*

In the retaliation context, a "[p]rotected activity refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  Although Plaintiff does not specify what protected activity she believes she engaged in, she appears to be arguing that she was retaliated against for requesting time off for religious reasons. ECF No. 57-1.  "While the Second Circuit has not expressly determined whether a request for a religious accommodation constitutes 'protected activity' for purposes of a Title VII retaliation claim, District Courts in this Circuit have held that it does." *See Privler v. CSX Transp. Inc.*, No. 1:18-CV-1020 (BKS/CFH), 2021 WL 3603334, at *19 (N.D.N.Y. Aug. 13, 2021) (collecting cases).  Thus, the Court will assume for purposes of this analysis that Plaintiff has engaged in protected activity.  Defendant does not dispute that it knew of Plaintiff's request and that Plaintiff was terminated from her position.  Thus, the only remaining issue is whether Plaintiff has presented evidence of a causal connection between the protected activity and the adverse employment action.

---

[6] While CFEPA and Title VII claims are generally analyzed using the same standards, it remains unclear whether retaliation claims under CFEPA are subject to a but for or motivating factor standard of causation.  *See Jones v. Natchaug Hosp.*, Inc., No. 3:17CV1099 (JBA), 2019 WL 4723066, at *8 n.2 (D. Conn. Sept. 25, 2019); *see also Wallace v. Caring Sols.*, LLC, 278 A.3d 586, 602 (Conn. App. 2022) (rejecting but-for causation requirement for CFEPA discrimination claims).  Here, the Court need not predict what standard of causation the Connecticut courts would apply to Plaintiff's CFEPA retaliation claim because her claim would fail under either standard.

The lone argument made in Plaintiff's brief that can be interpreted as one regarding this causal connection is that "Morales knew of Dawson's request for Sunday scheduling so she could go to her church where she was a minister but this was not truly accommodated."  ECF No. 57-1 at 13.  On its face, this is an argument regarding Defendant's alleged failure to accommodate, not its alleged retaliation.  But Plaintiff goes on to argue conclusorily that a jury could find "retaliatory animus" in Defendant's decision to terminate Plaintiff.  *Id.* at 14.  Neither Plaintiff's briefing nor her counsel's oral argument specified any causal connection between Plaintiff's allegedly protected activity of requesting a religious accommodation and her termination.  Very generously construing her opposition, and drawing all inferences in her favor, the Court speculates that Plaintiff is contending that the temporal proximity between her request for an accommodation and her termination suggests a causal connection.

In the Second Circuit, it has long been established that "a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'" *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996)).  While the Second Circuit has not "drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," it has "previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).  In the instant case, it is undisputed that Plaintiff requested a religious accommodation on February 22, 2019, and that her employment was ultimately terminated on April 26, 2019.  Pl.'s L. R. 56(a)2 St. ¶¶ 11, 31–33.  That there were only two months between Plaintiff's request for an accommodation and her eventual termination is enough to establish there

was a causal relationship for purposes of satisfying her *prima facie* case.  *See Gorzynski*, 596 F.3d at 110–111.

> b.  *Defendant Has Presented Non-Retaliatory Reasons for Plaintiff's Termination and Plaintiff has Failed to Demonstrate Pretext*

As discussed above, Defendant has provided several distinct reasons why Plaintiff was terminated including falsifying her time records and leaving her post unattended.  Thus, for the same reasons as those stated above, Defendant has presented non-retaliatory reasons for Plaintiff's termination, and "the presumption of retaliation arising from the establishment of the *prima facie* case drops from the picture."  *Zann Kwan*, 737 F.3d at 845.

Therefore, it is Plaintiff's burden to show that Defendant's proffered non-retaliatory reasons are mere pretext for an actual retaliatory motive.  A plaintiff must show that her protected activity was a "but-for" cause of the adverse employment action.  *Nassar*, 570 U.S. at 362.  In order to make this showing, Plaintiff is not required to prove "that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Zann Kwan*, 737 F.3d at 846.  Such a showing can be made by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Id.*  From such discrepancies, "a reasonable juror could conclude that the explanations were pretext for a prohibited reason."  *Id.*

Here, Plaintiff has failed to make a showing of such discrepancies, such that a reasonable jury could conclude that her termination would not have occurred in the absence of retaliatory motive.  Initially, it is undisputed that when the decision to terminate Plaintiff was made, the BIC was unaware of Plaintiff's gender, race, religion, veteran or disability status, or "similar information."  Pl.'s L. R. 56(a)2 St.  ¶¶ 5, 60.  There is no information in the record to suggest the

BIC was made aware of Plaintiff's request for Sunday mornings off, nor would such a fact be relevant to the incident where Plaintiff abandoned her post at Union Station, since that occurred early on a *Saturday* morning.  It is further undisputed that both falsifying one's time sheet and leaving one's post unattended are offenses that can lead to termination.  *Id.*  ¶¶ 61–65.  Plaintiff also admits that the Defendant's decision to terminate her for this conduct is consistent with all other know instances of similar conduct.  *Id.*  ¶ 66.

Plaintiff has pointed to no weaknesses, implausibilities, inconsistencies, or contradictions in the Defendant's proffered reasons.  Instead, she simply states "a jury could find that there was a discriminatory and retaliatory animus in terminating" Plaintiff.  ECF No. 57-1 at 14.  The Court disagrees.  The temporal proximity of Plaintiff's request for religious accommodation and her termination is not enough to meet Plaintiff's burden, particularly in light of the other, non-retaliatory reasons given for Plaintiff's termination.  As no reasonable jury could find that Plaintiff's request for a religious accommodation was a but-for cause of her termination, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

B. <u>Discrimination Under CFEPA and the ADA Based on Disability (Counts Two and Three)</u>

The Court now turns to Plaintiff's claims based on her purported disability.  As with CFEPA claims related to the same subject matter covered by Title VII, CFEPA claims related to disabilities are analyzed under the same standard as the ADA.  *Payne v. PSC Indus. Outsourcing, Ltd. P'ship*, 139 F. Supp. 3d 536, 543 (D. Conn. 2015).  Thus, the Court will once again analyze the state and federal claims together.  Further, as with her religious discrimination claims, precisely what theory of disability discrimination Plaintiff alleges is unclear.  A plaintiff may base a disability discrimination claim on "one of three theories of liability:  disparate treatment, disparate impact, or failure to make a reasonable accommodation."  *Davis v. Shah*, 821 F.3d 231, 260 (2d

21

Cir. 2016). It appears that Plaintiff here is pursuing disability discrimination claims alleging disparate treatment and a failure to accommodate. She is also pursuing a claim of retaliation. The Court once again examines each in turn.

### 1. Disability Discrimination Through Disparate Treatment

In order for Plaintiff to make a *prima facie* case of disability discrimination, she must show "(a) that [the] employer is subject to the ADA; (b) that [s]he is disabled within the meaning of the ADA or perceived to be so by h[er] employer; (c) that [s]he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that [s]he suffered an adverse employment action because of h[er] disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008). Here, Defendant does not contest that it is subject to the ADA, and that Plaintiff was otherwise qualified to perform the functions of her job. Thus, Plaintiff need only demonstrate that she was disabled within the meaning of the ADA and that she suffered an adverse employment action because of that disability. If Plaintiff can make this showing, the Defendant can rebut her claim through the introduction of legitimate nondiscriminatory reasons for her termination, and Plaintiff can then present evidence why these nondiscriminatory reasons are pretextual. *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) ("Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*."). As was the case with Plaintiff's religious discrimination claims, Plaintiff's intentional disability discrimination claims fail at each of these steps.

### a. *Plaintiff Has Failed to Prove Her Prima Facie Case*

Initially, notwithstanding that they are subject to the same analysis, CFEPA and the ADA differ in one way, specifically, what it means to have a handicap under the respective statutes. Turning first to the ADA, it defines a disability as "a physical or mental impairment that

substantially limits one or more major life activities of [an] individual, a record of such an impairment, or being regarded as having such an impairment." 42 U.S.C. § 12102(1).  In order to determine whether a major life activity is substantially limited by Plaintiff's purported disability, the Court considers "the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Ibela v. Allied Universal*, No. 21-1995-CV, 2022 WL 1418886, at *1 (2d Cir. May 5, 2022).  While an impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity" to be considered substantially limiting, not every impairment constitutes a disability under the ADA.  29 C.F.R. § 1630.2(j)(1)(ii).

For purposes of the ADA, Plaintiff has failed to establish that she has a physical condition that substantially limits her major life activity.  The medical condition that Plaintiff claims as a disability is a thyroid condition that Plaintiff describes only as "impact[ing] her daily life by way of headaches and fatigue."  ECF No. 57-1 at 11.  For Plaintiff to be considered disabled under the ADA, she must show that she had, or was regarded as having, a substantial limitation of a "major life activity," which is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(i); *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005).  In the instant action, Plaintiff makes no claim that her thyroid issue impacted her ability to perform manual tasks, walk, see, hear, speak, breath, or learn. Thus, the only possible major life activity Plaintiff's allegations implicate is the life activity of "working."   To show a substantial limitation in "working," Plaintiff must demonstrate her "limitation affects the ability to perform a class . . . or broad range of jobs." *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020).  If Plaintiff shows that the condition leaves her "unable to perform only a single, specific job, [s]he has failed to establish a substantial impairment

to [her] major life activity of working." *Id.* Here, Plaintiff has failed to demonstrate that she is unable to perform a class or broad range of jobs because of her purported disability.

The only evidence Plaintiff has proffered regarding her purported disability is a letter from her treating physician, Dr. Orett Brown, and his deposition testimony. Defendant has moved this Court twice to preclude consideration of this evidence. ECF Nos. 27, 54. While the Court previously ruled that Dr. Brown's testimony will only be considered to the extent that it deals with his treatment of Plaintiff and a reasonable reading of the medical records, the Court need not determine whether his current testimony, or the letter he submitted, complies with these parameters. This is because, even were the Court to consider Dr. Brown's testimony in whole, as explained below, it would not change the Court's ruling.

The Court begins with Dr. Brown's letter dated March 11, 2020. ECF No. 57-11. Setting aside that this letter was first sent after Plaintiff had been terminated, and thus could not have provided Defendant with notice of Plaintiff's purported disability before her termination, the letter also does not establish that Plaintiff in fact has a disability. Instead, it states only that she has "had challenges regarding the management of her thyroid disease" since October of 2017, that led to "headaches and fatigue." *Id.* The letter continues by stating that, after careful evaluation, Plaintiff's medication was adjusted with positive results. *Id.* The letter does not establish that Plaintiff was unable to work for Defendant, or to perform any other job, for any amount of time. In fact, based on the letter, Plaintiff's purported disability appears to have been resolved through adjustment of her medication, and there is no indication that it had, or would have, any lasting impact on Plaintiff's ability to perform her job. Thus, Dr. Brown's letter does not establish that Plaintiff was disabled under the ADA. *See Ibela*, 2022 WL 1418886, at *1.

Nor does Dr. Brown's deposition testimony aid Plaintiff on this point.[7]  *See* ECF No. 57-10.  Throughout the testimony, Dr. Brown makes clear that the symptoms Plaintiff was reportedly experiencing could have been due to either hyperthyroidism or an issue with her medication regulating her thyroid.  *Id.* at 77:20–78:3.  Dr. Brown's testimony does not discuss how these symptoms may have impacted Plaintiff.  The testimony does not demonstrate that Plaintiff would have been unable to work, for Defendant or otherwise.  As Plaintiff has failed to submit any evidence that her purported disability substantially limited one or more major life activities, for purposes of the ADA, Plaintiff has failed to raise an issue of material fact regarding whether she was disabled under the ADA.

Turning then to CFEPA, it defines one who is physically disabled as "any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or being hard of hearing or reliance on a wheelchair or other remedial appliance or device."  Conn. Gen. Stat. § 46a-51(15).  The CFEPA is not coextensive with the ADA, in that the CFEPA does not contain a requirement that a plaintiff's impairment substantially limit a major life activity.  *Buotote v. Illinois Tool Works, Inc.*, 815 F. Supp. 2d 549, 556 (D. Conn. 2011).

As Plaintiff makes no argument regarding why she had a chronic handicap, impairment or infirmity, the Court will only briefly address the issue.  While it is undisputed that Plaintiff was able to manage the symptoms of her condition with medication, "there is a split of authority on whether the plaintiff's condition must be unresponsive to medical treatment and ameliorative measures for the condition to be 'chronic'" for purposes of the CFEPA.  *Tryon v. EBM-Papst, Inc.*, No. HHBCV176037028S, 2017 WL 6273698, at *6 (Conn. Super. Ct. Nov. 9, 2017).  But even

---

[7] Plaintiff has provided the Court with only five substantive pages of the transcript of Dr. Brown.  *See* ECF No. 57-10.

assuming Plaintiff's condition was chronic under the CFEPA, Plaintiff would still be required to show she suffered from a handicap, infirmity, or impairment.  These terms are to be construed according to their common dictionary definitions.  *See Medvey v. Oxford Health Plans, Inc*., No. 3:01CV1977 (EBB), 2005 WL 2300379, at *18 (D. Conn. Sept. 20, 2005) (defining handicap as: "a disadvantage that makes achievement unusually difficult; especially: a physical disability that limits the capacity to work;"  infirm as: "not strong or sound physically; of poor or deteriorated vitality especially as a result of age; feeble;" and impair as "to make worse; diminish in quantity, value, excellence, or strength; do harm to; damage, lessen")  For the reasons discussed above, it is clear that neither Dr. Brown's letter nor his testimony raises a genuine issue of material fact regarding whether her medical condition caused a handicap, infirmity, or impairment under these commonsense definitions (and Plaintiff does not argue otherwise).

Even if Plaintiff could demonstrate that she was disabled under the ADA or CFEPA, however, she has failed to present any evidence at all that Defendant was aware of her disability such that she could have suffered an adverse employment action because of it.  First, Plaintiff admits that at the time she was hired she did not request a medical accommodation because she was not suffering any symptoms.  Pl.'s L. R. 56(a)2 St. ¶ 22.  She further admits that she "never needed a permanent accommodation" for her thyroid issue.  *Id.* ¶ 85.  Plaintiff also admits that she has no medical condition that has ever required an accommodation from any prior or subsequent employers, despite the fact that she has maintained employment working twelve-hour days, sometimes seven days a week.  *Id.* ¶ 81.  Finally, Plaintiff admits that the only documentation she provided to Defendant regarding any medical conditions or issues was not provided until *after* she was terminated.  *Id.* ¶ 27.

At oral argument, despite her admissions in her Local Rule 56(a)2 statement, Plaintiff argued that her affidavit submitted in opposition to summary judgment established that Defendant was aware of her purported disability.   Specifically, Plaintiff points to paragraph four of her affidavit, which states, "in or around November 22, 2018, I told Deilian Morales, in Human Resources that I needed time off.  I told her the problems that I was suffering from as a result of being over-worked, with no rest and thought I may have thyroid issues."  ECF No. 57-2 ¶ 4.  This, Plaintiff argues, put Defendant on notice that she was disabled and thus required Defendant to attempt to make a reasonable accommodation for her.  However, "a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove."  *Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010).  Nor may a party create a genuine issue of material fact by submitting an affidavit that contradicts her prior deposition testimony.  *Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion . . . that contradicts the affiant's previous deposition testimony.").  Here, Plaintiff admitted in her deposition that she sought the leave of absence in November of 2018 "to rest." *See* ECF No. 36-3 at 92:15–20.  She further recounted a conversation with Gonzalez on November 26, 2018, during which she requested the time off, but she could not recall what was said during the conversation, *id.* at 92:21–25 & 93:8–16, other than that she had headaches and fatigue.  Further, Plaintiff testified that she did not respond to emails she received in December of 2018 and April of 2019 from Defendant discussing her job performance with notice of her thyroid issue because she did not realize she was having a thyroid-related issue at either time.  Pl.'s L. R. 56(a)2 St., ¶¶ 86–88 (citing to Plaintiff's deposition transcript).

Therefore, even drawing all inferences in Plaintiff's favor, the only evidence presented to support her position that she informed the Defendant of her thyroid problem is the conclusory statement in her affidavit, which conflicts with the thrust of her deposition testimony. This does not suffice to create a genuine issue of material fact. *See Hicks*, 593 F.3d at 167; *Bickerstaff*, 196 F.3d at 455. Moreover, her vague statement that she informed Defendant that she thought she might have "thyroid issues," *see* ECF No. 57-2 ¶ 4, is insufficient to put Defendant on notice that she had a qualifying disability under either the CFEPA or the ADA. *See Longway v. Myers Industries, Inc.*, 812 Fed. Appx. 57, 58 (2d Cir. 2020) (finding employer did not have notice of disability where employee conceded he did not tell employer about his medical condition and, to the extent he communicated to the employer that he received medical treatment, he never characterized his condition "as anything other than a one-time injury of the sort that would not qualify as a disability" under either the CFEPA or the ADA). Thus, the Court holds that Defendant was not put on notice that Plaintiff had a disability under the CFEPA or the ADA, and therefore that Plaintiff could not have suffered an adverse employment action because of her disability. *See Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 644 (2d Cir. 2021) ("The employer's knowledge of the employee's disability is also required to establish the fourth element of a prima facie discrimination case, because the disability must be the but-for cause of the plaintiff's adverse employment action to satisfy that element.") (cleaned up);

In sum, Plaintiff posits that—despite Plaintiff not informing Defendant of her purported disability, not suffering any long-term effects or symptoms of her disability, not requesting an accommodation from any other employer, and not presenting any information that her disability

in any way affected her life outside or inside of work—Defendant somehow discriminated against her based on her purported disability.  No reasonable jury could agree.[8]

### 2.   *Disability Discrimination Through Failure to Accommodate*

Plaintiff has also failed to demonstrate discrimination under a theory of failure to accommodate.  In order to recover on such a theory, a plaintiff must show that "(1) [the] plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). "Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006). It is only where an employee's disability is "obvious" that the employer is required to accommodate the employee without having been alerted to the disability. *Brady*, 531 F.3d at 135.

Here, as discussed above, Plaintiff has presented no evidence—other than her conclusory affidavit—that she ever informed Defendant of her purported disability, or requested an accommodation for it, until after she had already been terminated.  Without knowing that Plaintiff needed an accommodation, or was even disabled, Defendant cannot have been expected to accommodate her.  Thus, no reasonable jury could conclude that Defendant's failure to accommodate Plaintiff constituted discrimination.

---

[8] As Plaintiff fails to demonstrate an issue of material fact such that a reasonable jury could find in her favor on her *prima facie* case, the Court need not examine whether there were nondiscriminatory reasons for terminating Plaintiff or whether such reasons were pretextual.  Were the Court do so, however, for substantially the reasons outlined in the previous section regarding Plaintiff's religious discrimination claims, it is clear that Defendant has proffered legitimate, nondiscriminatory reasons for terminating Plaintiff and Plaintiff has failed to raise an issue of material fact regarding whether such reasons were pretextual.  There is no dispute that Plaintiff never provided any documentation during her employment that substantiated her medical issues.  Pl.'s L.R. 56(a)2 St. ¶¶ 26-27.  Thus, the Plaintiff has still made no showing that would allow a jury to find Defendant's proffered reasons for her termination were pretextual.

### 3. Retaliation

Finally, Plaintiff has failed to demonstrate a question of material fact as to whether she was retaliated against based on her purported disability.  "To establish a *prima facie* case of retaliation under the ADA, a plaintiff is required to show by a preponderance of the evidence that: (1) she participated in a protected activity under the ADA; (2) the defendant knew of the protected activity; (3) the plaintiff experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action."  *Rios v. Dep't of Educ.*, 351 F. App'x 503, 505 (2d Cir. 2009) (italicization added).   For an ADA retaliation claim, merely seeking a reasonable accommodation constitutes a protected activity.  *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002).

As discussed above, however, Plaintiff never sought an accommodation due to her disability.  Nor has she presented evidence that she engaged in any other activity protected under the ADA.  Thus, no reasonable jury could conclude that Plaintiff engaged in protected activity such that she could have been retaliated against.

Defendant's motion for summary judgment as to Plaintiff's claims of disability discrimination is GRANTED.

## IV.     CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED in full.  Defendant's motion to preclude the testimony of Dr. Brown is DENIED as moot.

The Clerk of Court is directed to enter judgment for Defendant and close this case.

**SO ORDERED** at Hartford, Connecticut, this 6th day of December, 2022.

      /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE